[Civ. No. 11832. Fourth Dist., Div. Two. Feb. 21, 1973.]

COUNTY OF ORANGE et al., Plaintiffs and Respondents, v.
V. A. HEIM, as County Auditor, etc., Defendant and Appellant;
THE STATE OF CALIFORNIA ex rel. STATE LANDS COMMISSION,
Real Party in Interest and Respondent;
FRANK ROBINSON et al., Interveners and Appellants.

**COUNSEL**

Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Peter Smoot and Herman F. Selvin for Defendant and Appellant.

Phillip S. Berry for Interveners and Appellants.

Gibson, Dunn & Crutcher and Robert S. Warren for Plaintiffs and Respondents.

Evelle J. Younger, Attorney General, and Jay L. Shavelson, Assistant Attorney General, for Real Party in Interest and Respondent.

**OPINION**

**KAUFMAN, Acting P. J.—**

### The Case

This proceeding was commenced in the lower court as a "friendly suit" (see 2 Witkin, Cal. Procedure (2d ed. 1970) pp. 913-915) to establish the validity of a land exchange agreement and accompanying dredging and landfill agreement made between the County of Orange (County) and The

Irvine Company (Irvine) in connection with a plan (hereinafter the Plan) for the development of Upper Newport Bay (UNB) as a harbor. It has developed into a truly adversary litigation of substantial proportions.

By amended pleadings, County, Irvine and the Orange County Harbor District (Harbor District), which joined as a copetitioner, sought a writ of mandate to compel the Orange County Auditor (Heim) to issue a warrant for payment of County's agreed share of engineering costs incurred in a soils investigation study made pursuant to the land exchange agreement and dredging and landfill agreement as amended. Also sought were declarations that the several agreements are valid and in compliance with the enabling legislation and the California Constitution. The State of California (State) acting by and through its State Lands Commission (SLC)[1] joined as a real party in interest (see Pub. Resources Code, § 6308), admitted the allegations of the amended petition and joined in the prayer for relief. Heim answered denying the essential allegations of the amended petition and sought a declaration that the enabling legislation and the agreements were unconstitutional, invalid and unenforceable. By leave of the court Frank and Frances Robinson, Harold and Joan Coverdale and Wesley and Judith Marx (Interveners), residents of Orange County, filed a complaint in intervention also asserting the invalidity of the enabling legislation and the several agreements.

Following a trial to the court of some 28 trial days, during which the court heard testimony of some 20 witnesses and received more than 100 exhibits and made 2 inspections of UNB, one by boat and one by automobile, the court rendered a thoughtful memorandum opinion (later modified), made extensive findings of fact and conclusions of law and, on February 11, 1971 gave judgment for petitioners as prayed.[2] Heim and Interveners (collectively appellants) appeal from the judgment.[3]

---

[1]State Lands Commission is now a part of the Department of Conservation and consists of the State Controller, the Lieutenant Governor and the Director of Finance. (Pub. Resources Code, § 6101.) The SLC administers all laws and statutes committed to it through the Division of State Lands now also a part of the Department of Conservation. (Pub. Resources Code, § 6103.) The Division of State Lands is headed by an executive officer and serves as the staff for the SLC.

[2]The judgment was entered February 18, 1971. It ordered the issuance of a peremptory writ of mandate as prayed; declared the enabling legislation and the agreements between County and Irvine valid and constitutional; and further declared the land to be conveyed and released to Irvine by County to be free from the public trust for navigation, commerce and fishing upon consummation of the land exchange.

[3]On January 28, 1971, after trial and rendition by the trial court of its memorandum opinion, but prior to the adoption of findings of fact and conclusions of law and prior to judgment, County and Harbor District moved the court to dismiss the action as moot. The motion was based upon a resolution of the Board of Supervisors

## Pertinent Facts

UNB is a portion of a single bay known as Newport Harbor or Newport Bay. It is that portion of the greater harbor which extends north of the Pacific Coast Highway and it and its tidelands are now located entirely within the limits of the City of Newport Beach and within the area encompassed by Harbor District.

In 1901, James Irvine, predecessor in interest to Irvine Company, received from the State of California a tidelands patent to some 243 acres of tidelands lying at the upper end of UNB (hereinafter the patented tidelands). Irvine is the fee owner of these patented tidelands, but its fee ownership is subject to a public easement and right generally referred to as the public easement or trust for navigation, commerce and fishing. (See *Marks* v. *Whitney,* 6 Cal.3d 251, 258-259 [98 Cal.Rptr. 790, 491 P.2d 374]; *City of Long Beach* v. *Mansell,* 3 Cal.3d 462, 482 [91 Cal.Rptr. 23, 476 P.2d 423]; *Newcomb* v. *City of Newport Beach,* 7 Cal.2d 393, 401 [60 P.2d 825]; *People* v. *California Fish Co.,* 166 Cal. 576, 596 [138 P. 79].)[4] Irvine also claims to be[5] the fee owner of three islands, comprising 103.3 acres of uplands, lying astride the channel of UNB as well as substantially all of the uplands contiguous to UNB and its tidelands.[6]

By chapter 526, Statutes of 1919 as amended by chapter 575, Statutes of 1929[7] (the granting statutes) the State granted to County, in trust, the

---

of Orange County adopted January 5, 1971, expressing County's desire and intention to rescind the land exchange agreement. The motion to dismiss was denied without prejudice, and we are advised that the right of County to withdraw from the land exchange agreement is the subject of a lawsuit now pending between County and Irvine. Accordingly, County and Harbor District have made no effort to support the judgment and have not filed briefs on appeal.

[4]The public easement has been specifically adjudicated as to these patented tidelands by the decree in Orange County v. Irvine Company, Orange County Superior Court case number 20436 dated May 6, 1926.

[5]We use the words "claims to be" advisedly. For purposes of this decision, we accept as a fact, as found by the trial court, that these islands are uplands owned in fee by Irvine. In fact, we shall hereinafter refer to these islands as the Irvine-owned islands. However, Interveners attempt to raise some question as to whether some portion of these islands are actually tidelands, and a person not a party to the proceedings below requested and was refused permission to intervene on appeal contending that Irvine does not own these islands at all. These matters may, for all we know, have long since been adjudicated. In any event, the present proceeding was not pleaded nor tried as a quiet title action, and the judgment *in this proceeding* is not dispositive of questions concerning title to these islands, if any such questions there be.

[6]Harbor District owns 8.1 acres of adjoining uplands known as Coney Island. (See also, fn. 8, *infra.*)

[7]The sole effect of the 1929 amendment was to extend from 25 to 50 years the permissible term of franchises and leases to be granted or made by County.

tidelands and submerged lands bordering upon and under UNB then outside the city limits of Newport Beach. These lands, although technically a combination of tidelands and submerged lands (see *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 478, fn. 13), will hereinafter be referred to as the granted tidelands or the County tidelands. They comprise some 403.7 acres.

The granting statutes specifically provide that the grant from the State to the County is made for the purpose of the County's establishing, improving and conducting a public harbor and related facilities without expense to the State. They further provide that, except for franchises or leases not to exceed 50 years, "said county or its successors shall not at any time grant, convey, give or alien said lands or any part thereof to any individual, firm, or corporation for any purposes whatever."

To this date County has not been able to implement the purpose expressed in the granting statute, developing UNB as a harbor. Although all of the granted tidelands area is at one time or another covered by water, only a portion of the area is actually navigable. The main channel is blocked by the three islands owned by Irvine, which leave only small, winding channels, creating congestion for boats and limiting large scale public recreational use. Other impediments to full harbor development are limited access due to the fact that precipitous bluffs surround much of the bay and that Irvine owns nearly all of the contiguous uplands.[8] Portions of these uplands have steadily been developed with homes and apartments, thus restricting their availability for use in connection with public planning for a harbor, and at all times during the development of the Plan and its approval, Irvine consistently indicated its intention to develop the three islands owned by it in the channel.

Over the past 45 years, commencing in 1925, a number of studies have been made concerning the development of UNB as a harbor. Each study acknowledged the necessity of dredging away the Irvine-owned islands to widen the existing channel. Most, if not all, of the studies envisioned an alienation or exchange of granted tidelands for the Irvine-owned islands and portions of the contiguous uplands.

---

[8]In finding numbered 9(c) the trial court found in pertinent part: "The UNB is substantially surrounded by high bluffs from 40 to 100 feet in height which impair public access to the waterway. Further, aside from the perimeter of the public park known as the Dunes, a roadway which intermittently touches the tidelands grant along 1,215 feet on the east edge, and North Star Lane which runs for a distance of approximately 800 feet along the tidelands grant, the surrounding uplands at the point of contiguity with the granted tidelands are owned by Irvine."

In view of the prohibition against alienation of the granted tidelands in the granting statutes, effectuation of any such plan required legislative authorization. Legislation to this end was introduced in the Legislature in 1939, 1941, 1951 and 1957. By chapter 2044 of the Statutes of 1957 (hereinafter chapter 2044 or the enabling act), the Legislature purported to authorize the development of UNB as a harbor by the utilization of some such plan or land exchange. This enabling act recites that, in the course of the improvement and development of Newport Bay as a harbor, portions of the granted tidelands have been (§ 1) or may in the future be (§ 2) filled and reclaimed and thereby excluded from the public channels and declares that such lands are (§ 1) and will be (§ 2) no longer "available or useful or susceptible of being used for navigation, commerce and fishing" and are (§ 1) or "when so improved, filled and reclaimed," will be deemed (§ 2) "free from the public use and trust for navigation, commerce and fishery." Section 3 of the act purports to permit the conveyance of the tidelands thus freed from the public trust into private ownership in exchange for privately owned contiguous uplands with the approval and concurrence of the SLC after findings by the SLC "that the lands located in . . . Upper Newport Bay which are to be exchanged are no longer useful for navigation, commerce and fishing and that the lands to be received in exchange are at least of equal value thereto." Section 3 further specifies that the land received by County in exchange "shall be used by the County only for purposes of statewide interest."

Following enactment of chapter 2044, County, Harbor District and Irvine proceeded to attempt to devise a final plan for the development of an improved harbor in the UNB. After many public hearings, consultation with recognized experts and affected public agencies and after consideration of all the prior planning and modification of several proposed plans, County, Harbor District and Irvine finally settled on the Plan entitled "Upper Newport Bay Land Exchange Plan," dated March 31, 1964.[9] Pursuant to the Plan, on January 13, 1965, County, Harbor District and Irvine entered into the land exchange agreement and the dredging and landfill agreement challenged in this proceeding.

The Plan envisions the creation of a navigable waterway averaging 800

---

[9] This document was introduced into evidence as petitioners' exhibit 1. It is a document of considerable proportions, bound in booklet form and, in addition to verbal and mathematical summaries of the land exchange and dredging and landfill plans, embodies eight roman numbered appendices consisting of colored, scaled diagrams of the land ownerships before the proposed exchange, the lands to be filled and dredged, the lands to be exchanged, the land ownerships after the proposed exchange, a harbor line map setting forth pierhead and bulkhead coordinates and a general use map showing roadways and general land uses anticipated following the land exchange.

feet in width extending about 2.5 miles north from the Pacific Coast Highway bridge, which is to be reconstructed at a higher level. At the north end of the granted (County) tidelands, the waterway would widen into a turning basin. Beyond this, mainly on what are now patented (Irvine) tidelands, there would be a mile-long rowing course and a marine stadium separated by a long, somewhat narrow arm of public park land fronted by a swimming beach. To the north of the marine stadium, the general use diagram attached as appendix VIII to the Plan depicts additional public park land with boat launching facilities. About halfway between the north and south ends of the new waterway on the east side there is depicted a public park of approximately 67 acres having about 1,600 feet of channel frontage. On the west side of the new waterway the only public ownership indicated consists of two small parks, each less than five acres, both having beaches along their 400 to 600 feet of water frontage. On the southeast side of the waterway there is depicted a public park with a swimming lagoon and boat launching facilities comprising approximately 70 acres, but this property is already in public ownership.[10] All of the remaining land contiguous to the new waterway would be owned by Irvine and, according to the general use diagram would be used in various parts for low-density housing, medium-density housing, aquatic commercial uses and private boat basins.

To accomplish this, portions of the three islands owned by Irvine together with certain portions of Irvine's contiguous fee-owned uplands are to be dredged away to create the waterway and, in effect, moved to the sides of the waterway. Portions of the filled areas to the sides of the waterway are to be conveyed to Irvine in exchange for the Irvine properties to be dredged away. In addition, Irvine is to convey to County a total of 120 acres of fee-owned uplands contiguous to UNB which, according to the general use diagram, are to be utilized by County for access and public park lands as described in the foregoing paragraph. Finally, Irvine is to convey to County its fee ownership of a portion of the patented tidelands, and County is to release the remaining portions of the patented tidelands from the easement and public trust for navigation, commerce and fishing.

Following execution of the land exchange agreement and the dredging and landfill agreement, the Plan was submitted to the SLC for its study and approval was sought of the proposed land exchange. After extensive staff work, the Plan first came before the SLC for formal consideration in August 1966. The executive officer of the SLC (Mr. Hortig), although

---

[10]It consists of filled tidelands known as the "Dunes" and "Coney Island" owned by Harbor District (see fn. 6, *ante*).

finding a substantial dollar benefit in favor of County, recommended that approval of the exchange be withheld pending the exploration of alternatives.[11] Following a public hearing, the SLC accepted the recommendation of its executive officer to withhold approval and directed the exploration of alternatives.

Pursuant to the direction of the SLC to explore alternatives, the SLC staff obtained a report respecting the Plan and possible alternatives from an independent consulting agency, explored the possibilities of renegotiating the terms of the exchange with Irvine, and explored the availability of funds to accomplish an entirely public development of the UNB by means of condemnation of all the Irvine lands involved. On the basis of this work, the executive officer of the SLC ultimately concluded that it was in the statewide interest to approve the exchange.[12] Another public hearing was

---

[11]The staff's conclusions were submitted to the SLC as follows:

"Based solely on land appraisal values, the statutory requirement for equality in the values to be exchanged would be more than met. However, the ultimate outcome would be a distinct loss in value when measured in the scale of Statewide public interest. The reasons for this conclusion are:

"1. It cannot be established clearly that all the lands which are to be exchanged are no longer useful for navigation, commerce and fishing.

"2. Realignment and relocation of the public waterways as proposed would diminish the greater public use which could be developed otherwise.

"3. Removing the burden of easement and enlarging the Irvine lands into usable private areas would be a purely local benefit which would convert public waterways into a captive waterway primarily for the use of the private residential boat owners who would occupy the created area and dominate the bay.

"4. The project would create commercial areas completely privately controlled which could add to the preponderant private domination of the bay."

[12]In pertinent part the staff's findings and conclusions were presented to the SLC as follows:

"Data developed indicates that the project is large enough to be of Statewide interest, and that the following advantages would accrue from the development of the proposed project:

"1. The area under public jurisdiction is increased from about 400 to 745 acres, an increase of 345 acres or over 86%.

"2. The area available for public park and beach areas is increased from 70 to 261 acres, an increase of 191 acres or 273%.

"3. The waterfront public access, including that in front of the park areas, is increased from about 6,090 to 17,880 lineal feet, an increase of over 193%.

"4. The development of the area in the interest of the people of the State of California would be made feasible by the approval of the exchange.

"5. Approval of the exchange would make it feasible to have early development of aquatic facilities currently needed by the University of California at Irvine and other educational institutions, including a five-acre waterfront site and a 2000-meter rowing course.

"6. Access is provided by several major county and city arterial roads, which connect to two existing and two future freeways within one mile of the public areas.

"7. Approval of the exchange would make feasible development that would provide for an estimated increase of from 8 to 17.2 million user-days for greater Newport Harbor."

held by the SLC on September 25, 1967. Following the public hearing, on September 25, 1967, the SLC unanimously adopted a resolution approving the proposed land exchange. The resolution embodied express findings, "that the lands that are to be filled and conveyed to The Irvine Company by the County of Orange, pursuant to the exchange and in accordance with the application filed with the State Lands Commission, at the time of said conveyance, will be no longer useful for navigation, commerce and fishing" and "that the lands to be received by Orange County in the exchange with The Irvine Company are at least of equal value to the lands to be transferred to The Irvine Company."

Following approval of the proposed land exchange by the SLC, County and Harbor District applied to the Department of the Army for approval of harbor lines in accordance with the land exchange agreement, but found that by that time the Department of the Army, as a matter of policy, was no longer fixing harbor lines in recreational harbors. Accordingly, in December 1967, County and Harbor District secured informal approval by the Department of the Army Corps of Engineers of the harbor lines specified in the Plan and the land exchange agreement and on January 30, 1968, County adopted an ordinance fixing the harbor lines in accordance with the Plan and land exchange agreement.

On November 12, 1968, County, Irvine and Harbor District executed an amendment to agreement, amending both the land exchange agreement and the dredging and landfill agreement. It changed the requirement of the original agreement that approval of harbor lines be secured from the Department of Army and required instead "securing such approval, consents or permits for the establishment of harbor lines and dredging as required by appropriate governmental agencies." The amendment also provided that the Irvine lands to be received by County in the exchange would

It was also indicated that the Resources Agency (see Gov. Code, §§ 12880, 12805) reported the desirability of providing for preservation and improvement of the marine ecology in any development program and that County had indicated its willingness to cooperate with the Resources Agency in this regard.

Additionally, it was reported that an independent appraisal showed a dollar advantage to County in the exchange of in excess of eight million dollars. While the staff appraisal questioned some of the values assigned in the independent appraisal, the staff concluded that the lands to be received by County were at least of equal value to the land to be transferred to Irvine. At the request of the SLC and in connection with the appraisal, County, Harbor District and Irvine entered into a supplement to agreement more particularly identifying certain leases to which properties involved in the exchange were subject. No party makes any point on appeal concerning this supplement to agreement and we can perceive no effect it has on the case except as respects the valuation of the properties to be exchanged. References hereafter made to the land exchange agreement shall refer to the agreement as thus supplemented.

be immediately conveyed to County on conditions subsequent that should the exchange not be consummated these lands would be returned to Irvine and Irvine would, in that event, pay County a sum equivalent to the tax revenue lost by the immediate conveyance. Additionally, the dredging and landfill agreement was modified in several respects, primarily to provide for dredging in a single stage rather than two stages as originally agreed. The amendment to agreement was never presented to the SLC for approval.

Thereafter, pursuant to the dredging and landfill agreement, a contract was awarded by Irvine and approved by Harbor District for a soils investigation required for the preparation of a dredging and filling plan. Work proceeded under this contract, and pursuant to the dredging and landfill agreement, Irvine rendered a written statement of the costs of the soils investigation to Harbor District. Under the terms of the dredging and landfill agreement, Harbor District thereby became obligated to reimburse Irvine for one-half of the amount of such statement, $13,917.72. The claim was approved by Harbor District and subsequently approved and allowed by the board of supervisors of County and was duly endorsed, attested and countersigned and transmitted to Heim as county auditor for payment by issuance of a warrant. Heim, as county auditor, had and has at his disposal the funds and means to comply with the direction of the board of supervisors to pay Irvine said sum, but he declined to do so on the grounds that the agreements between County and Irvine are invalid and unconstitutional.

To avoid undue repetition, further factual details will be set forth in connection with the considerations of various issues.

### Preliminary Observations

First, although it might be deemed unusual, we think it appropriate to compliment the trial judge and counsel in this case. The record reflects remarkable conscientiousness and prodigious effort on the part of the trial judge, some of which effort was expressly directed toward facilitating review on appeal which was recognized as likely by all concerned. Despite its length and the large quantity of evidence received, the trial was remarkably free from error except as to the trial court's conclusions involving application of the difficult existing law, which we deem controlling. The trial presentations were, and the briefs and supplemental briefs on appeal are, of the highest quality. Their scholarship has facilitated our work, but their persuasiveness on each side has made decision difficult.

### Contentions, Issues and Disposition

From our viewpoint, the case and the contentions of the parties raise not

only the ultimate question of the validity of the land exchange agreement but also grave questions relating to the proper operation of our tripartite system of constitutional government, specifically the proper function of the judiciary vis-a-vis the Legislature and the SLC exercising quasi-legislative functions. (See Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich.L.Rev. 471, p. 491 et seq., particularly pp. 557-565.) These fundamental questions are made more complex by the fact that the tidelands trust with which we are dealing in this case is embodied in the California Constitution. (E.g., Cal. Const., art. XV, § 3.) Moreover, in resolving these problems we, as an intermediate appellate court, are not entirely free. We are bound by pertinent decisions of the California Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court,* 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] and cases there cited; *Allen* v. *California Board of Barber Examiners,* 25 Cal.App.3d 1014, 1020 [102 Cal.Rptr. 368].) With some misgivings, we have concluded that the land exchange agreement and the action of the SLC purporting to free from the constitutional tidelands trust the lands to be conveyed to Irvine are violative of the prohibition against alienation of tidelands into private ownership found in article XV, section 3 of the California Constitution as interpreted and applied in *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pages 482-486. This conclusion makes unnecessary our consideration of a number of contentions of the parties, but the fundamental nature of the questions presented and the interrelation of several of the issues require considerable exposition.

It is argued in connection with several issues that the Plan is not the best plan that could be devised from the public standpoint and, even, that the UNB, or at least portions thereof, ought not to be developed as a recreational harbor but ought to be preserved in its natural state. These are not matters to be decided by the courts. While the preservation of tidelands in their natural state is now recognized as a use encompassed in the tidelands trust purposes (*Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 259-260), it is the Legislature that administers the trust, and it is within the province of the Legislature to prefer one trust use over another. (*People* v. *California Fish Co., supra,* 166 Cal. at p. 597; *City of Coronado* v. *San Diego Unified Port District,* 227 Cal.App.2d 455, 471-473 [38 Cal.Rptr. 834]; see also *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 477, 482, fn. 17; *Muchenberger* v. *City of Santa Monica,* 206 Cal. 635, 644 [275 P. 803].) The use preferred for UNB by the Legislature in 1919, 1929 and 1957 was the establishment of a harbor and related facilities. Some of the difficulty presented by this case undoubtedly derives from the fact that, since these legislative declarations of preference, there has taken place a virtual revolution in thought about the relative values of trust uses. (See e.g., *Marks* v.

*Whitney, supra;* Note: *California's Tideland Trust: Shoring It Up,* 22 Hastings L.J. 759, 771-781; Sax, *supra,* 68 Mich.L.Rev. at pp. 473-474.) It may well be that if it were confronted with the question today, the Legislature would prefer trust uses for UNB other than those it preferred in 1919, 1929 and 1957. But, as indicated, this is a legislative question, and we can only point out that, disregarding any possible claims for compensation, valid or invalid, which might ensue, it is even now within the power of the Legislature to revoke, alter or amend the granting or enabling statutes. (*Illinois Cent. R. R.* v. *Illinois,* 146 U.S. 387, 453-454, 455 [36 L.Ed. 1018, 1043, 13 S.Ct. 110]; *City of Coronado* v. *San Diego Unified Port District, supra,* 227 Cal.App.2d at pp. 473-474; see also *Mallon* v. *City of Long Beach,* 44 Cal.2d 199, 208-209 [282 P.2d 481]; *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville,* 69 Cal.2d 533, 549 [72 Cal.Rptr. 790, 446 P.2d 790].) Moreover, as we shall hereinafter have occasion to point out, no dredging and filling could commence nor could the land exchange be consummated without review by a number of governmental agencies and compliance with several recently enacted state and federal statutes, which would ensure the program's compatibility with environmental quality maintenance.

■ We quickly dispose of three contentions of appellants. The enabling act (Stats. 1957, ch. 2044) is not invalid as special legislation under article IV, section 16 of the California Constitution. The constitutional provision reads: "A local or special statute is invalid in any case if a general statute can be made applicable." UNB and the conditions affecting it are unique, and we can perceive of no general statute that could be made applicable.

■ Neither can the proposed land exchange agreement be said to be contrary to the prohibition against alienation contained in the granting statutes of 1919 and 1929. As previously noted, the Legislature retains the power to alter, amend, or revoke a statutory grant of tidelands to a governmental agency, and the enabling act of 1957 constituted, in effect, an amendment of the granting statutes, eliminating, *pro tanto,* the prohibition against alienation. (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville, supra,* 69 Cal.2d at p. 549.)

■ We also reject the contention that the amendment to agreement of November 12, 1968, required re-submission of the exchange agreement to the SLC. The amendment to agreement made no substantive change in the land exchange agreement pertinent to the consideration of the SLC. Contrary to appellants' argument, the harbor lines were not changed by the amendment. They had been previously agreed upon by the parties in connection with the land exchange and dredging and landfill agreements and where subsequently fixed by ordinance in accordance with the previous

agreement. The only change effected by the amendment in this regard was to eliminate the requirement that approval of harbor lines be secured from the Department of the Army and to insert in lieu thereof a requirement that approval, consents or permits for the establishment of harbor lines and dredging be obtained from appropriate governmental agencies. Of course, if any such appropriate governmental agency should require changes in the harbor lines agreed to by the parties resulting in a change of the lands to be exchanged, re-submission to the SLC would be required, but the amendment to agreement did not itself have that effect.

We turn now to the dispositive issues.

Article XV, section 3 of the California Constitution provides in pertinent part: "All tidelands within two miles of any incorporated city, city and county, or town in this State, and fronting on the water of any harbor, estuary, bay or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships or corporations; . . ."[13] This constitutional provision (sometimes hereinafter referred to as the constitutional tidelands trust) was recently interpreted and applied by the California Supreme Court in *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462. Distinguishing the common law tidelands trust doctrine,[14] the court in

---

[13]This constitutional provision became effective in 1879 after extensive debate in the California Constitutional Convention of 1878-1879 (see *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 504 et seq. [Appendix B]). It remained unchanged until 1962 at which time the words "city and county" contained in the quoted excerpt above were added. At the same time the following proviso was also added: "provided, however, that any such tidelands, reserved to the State solely for street purposes, which the Legislature finds and declares are not used for navigation purposes and are not necessary for such purposes may be sold to any town, city, county, city and county, municipal corporation, private persons, partnerships or corporations subject to such conditions as the Legislature determines are necessary to be imposed in connection with any such sales in order to protect the public interest."

The proviso added in 1962 is not here pertinent except that, in our view, its addition serves to reinforce the absolute nature of the prohibition set forth in the first part of the section.

Since 1909 (Stats. 1909, ch. 444, § 1, p. 774) sale of tidelands and submerged lands has also been statutorily proscribed. (Pub. Resources Code, § 7991.) Indeed, at the time article XV, section 3 was adopted as a part of the California Constitution of 1879 there already existed in the statutes an almost identical prohibition against the sale of tidelands within two miles of any town or village. (Stats. 1869-1870, ch. 573, § 70, pp. 877-878; see *San Pedro etc. R.R. Co.* v. *Hamilton,* 161 Cal. 610, 618 [119 P. 1073]; *People* v. *Kerber,* 152 Cal. 731, 735 [93 P. 878].)

[14]Appellants are incorrect in asserting that the court in *Mansell* dealt only with the common law trust doctrine. It is true that the *Mansell* decision applied to the constitutional tidelands trust problem some of the rules and theories applicable to the common law trust doctrine. It is also true that the *Mansell* court briefly discussed the common law trust doctrine, noting that a comprehensive explanation of the common law trust is to be found in *People* v. *California Fish Co., supra,* 166 Cal. at pp. 583-603. (3 Cal.3d at p. 482.) It did so, however, purely for the purpose of distinguishing

*Mansell* specifically recognized the flat prohibition in article XV, section 3 of the California Constitution against alienation of tidelands within two miles of an incorporated city (3 Cal.3d at p. 482) but, nevertheless, delineated three situations in which the prohibition did not apply: (1) the settlement of a genuine boundary dispute (3 Cal.3d at pp. 480-481); (2) a situation in which the circumstances are such as to create an equitable estoppel (3 Cal.3d at pp. 486-501); and (3) under the particular, limited circumstances there involved, a small, beneficial land exchange. Neither a boundary dispute nor equitable estoppel are involved in the case at bench. Respondents contend and the trial court found, however, the land exchange agreement here in question to be constitutional under the principles explicated in *Mansell* relating to the land exchange in that case.

The land exchange proposed in *Mansell* may be summarized as follows. Some five acres of tidelands had been filled and reclaimed in the course of a public program of harbor development which resulted in the creation of Marine Stadium in Long Beach. These five acres were to be conveyed to the McGrath Testamentary Trust in exchange for 8.5 acres of McGrath lands abutting either Long Beach Harbor or existing public trust facilities. The 8.5-acre parcel was said to be of such a configuration that it could be used more effectively by the city and state in furtherance of the public trust purposes than the 5 acres to be exchanged therefor. Moreover, the exchange itself was sought to be made in furtherance of an existing and on-going program of harbor development. (3 Cal.3d at pp. 477, 486.)

In upholding this exchange, the court stated:

"However the language in *Atwood* [*Atwood* v. *Hammond,* 4 Cal.2d 31, 41-43 (48 P.2d 20)] may be characterized in terms of its value as precedent, we think that it represents a clear statement of this court that article XV, section 3, does not forbid alienation of lands within two miles of an incorporated city which have been reclaimed 'as the result of a highly beneficial program of harbor development,' are relatively small in area, and have been freed of the public trust by legislative act. . . . [¶] Secondly, we consider that the principle of the *Atwood* case is wholly consistent with the purposes of the framers of the Constitution. The debates at the Constitutional Convention, to which we have adverted above, reveal a general intention to retain tidelands within two miles of incorporated cities

---

between the common law tidelands trust and the constitutional tidelands trust. (3 Cal.3d at p. 482.) The *Mansell* court specifically pointed out that "[a]ll of the lands involved in this proceeding lie within the city limits of Long Beach." (3 Cal.3d at p. 478.)

in order that such tidelands might be utilized in the public interest for navigational and related purposes rather than in the interest of private persons to whom they might be granted. Surely if in the course of, and for the purpose of carrying out, a comprehensive public program of harbor development certain portions of tidelands are filled under circumstances clearly showing that, in the light of the relatively minor area involved and the manner of reclamation in relation to the program as a whole, such reclamation is merely a reasonably necessary incident of the program and of the promotion of its public objective, and if thereafter such filled areas are declared by the Legislature to be of no value for navigational and related purposes, then we think that a sale and transfer into private ownership of such filled-in areas might be found to be entirely consistent with the intention and objective of the framers of the Constitution. But we emphasize that the circumstances under which this may occur are of necessity unique, that the conditions sanctioning its approval must be scrupulously observed and satisfied, and that generally speaking the reclaimed area alleged to be free from both the public trust and the constitutional restriction against alienation into private ownership must be, as it were, a residual product of the larger program—a 'relatively small parcel' to use the language of *Atwood* (4 Cal.2d at p. 43)—determined by the Legislature to have no further value for the purposes of the public easement.

"To reiterate, we conclude that when lands within two miles of an incorporated city or town which were subject to the ebb and flow of the tide at the date of the adoption of the Constitution—and which therefore are 'tidelands' within the meaning of article XV, section 3—(1) have been found and determined by the Legislature to be valueless for trust purposes and are freed from the public trust [reference to prior footnote omitted] and (2) have been or are to be reclaimed pursuant to and in the course of a highly beneficial public program of harbor development, such lands—if they constitute a relatively small parcel of the total acreage involved—thereupon cease to be 'tidelands' within the meaning of the constitutional provision and are subject to alienation into absolute private ownership. [Fn. omitted.]" (3 Cal.3d at pp. 484, 485-486.)

Our task is to determine whether the land exchange agreement in the case at bench "scrupulously satisfies" the several conditions with which the court in *Mansell* so carefully circumscribed the permissible conveyance of article XV, section 3 tidelands into private ownership as part of a beneficial land exchange.

At the outset, appellants urge that the formulation set forth in *Mansell* was not intended to apply to a situation in which the tidelands to be conveyed were filled, reclaimed and rendered "useless" for trust purposes inten-

tionally for the purpose of exchange. Essentially this question was noted but unanswered in *People* v. *Kerber,* 152 Cal. 731, 736-737 [93 P. 878]. Neither is it fully answered by *Mansell.* Although the five acres of tidelands to be exchanged in *Mansell* were filled and reclaimed in the course of the program of harbor development resulting in the Long Beach Marine Stadium, we surmise that they were not filled and reclaimed for the purpose of exchanging them. However, in reiterating its conclusions (see *Mansell* quotation, *ante*), the court in *Mansell* added a dictum which, although not binding upon us (*People* v. *Gregg,* 5 Cal.App.3d 502, 506 [85 Cal.Rptr. 273]; *Hess* v. *Whitsitt,* 257 Cal.App.2d 552, 556 [65 Cal.Rptr. 45, 32 A.L.R.3d 1297]; see 6 Witkin, Cal. Procedure (2d ed. 1971) pp. 4589-4591) throws some light on this question. In speaking of the second condition to any proposed exchange, the court stated that the lands to be exchanged must "have been *or are to be* reclaimed pursuant to and in the course of a highly beneficial public program of harbor development . . . ." (3 Cal.3d at p. 486; italics supplied.) The use of the italicized language indicates that the lands to be exchanged could be filled, reclaimed and made "useless" for trust purposes intentionally and by planning if such were done in connection with a larger program of harbor development. We perceive no reason for holding invalid an exchange which would otherwise be valid under the *Mansell* formulation simply because the land to be exchanged was reclaimed for the purpose of exchange, so long as the reclamation was made in connection with a larger program of harbor development. (Cf. *City of Milwaukee* v. *State* (1927) 193 Wis. 423 [214 N.W. 820, 54 A.L.R. 419], cited with approval in *Mansell,* 3 Cal.3d at p. 483.) The acceptance of appellants' argument would penalize planning, and in respect to these matters what is needed is more planning, not less.[15]

■ Next, albeit out of order, we consider another of appellants' arguments because of its similarity to that just considered. The argument is that there has been no effective finding of "uselessness" for trust purposes because

---

[15]A further indication that the lands to be conveyed may be filled, reclaimed, and made "useless" for trust purposes by design and, indeed, for the purpose of their conveyance may be found in the *Mansell* court's statement that the San Francisco Bay tidelands transfers would not have violated article XV, section 3 of the California Constitution had that article existed at that time. (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 484-485.) The statutes authorizing disposition of the San Francisco Bay tidelands were wholly prospective and involved the intentional and planned filling, reclaiming and rendering "useless" for trust purposes a large quantity of tidelands and submerged lands bordering and under San Francisco Bay for the purpose of outright sale. (See Stats. 1867-1868, ch. 543, p. 716; Stats. 1869-1870, ch. 388, p. 541; *Knudson* v. *Kearney,* 171 Cal. 250, 251-252 [152 P. 541]; *People* v. *California Fish Co., supra,* 166 Cal. at pp. 585-586.) We choose not to rely on this statement, however, for as we hereinafter observe, we view this statement as a dictum, and, in all due deference, we think it incorrect.

the SLC found in 1967 that the lands to be conveyed to Irvine pursuant to the exchange *"will be* [when filled] *no longer useful* for navigation, commerce and fishing" (italics supplied), whereas the enabling statute (Stats. 1957, ch. 2044) authorized conveyance by the exchange only upon a finding by the SLC that the lands "which are to be exchanged *are no longer useful* for navigation, commerce and fishing . . . ." (Italics supplied.) The argument is unpersuasive. The "or are to be" dictum in *Mansell* quoted above indicates the propriety of a legislative finding of "uselessness" in futuro. Moreover, chapter 2044 itself spoke of lands to be reclaimed in the future pursuant to a plan of harbor development (§ 2). We think it obvious that, in requiring approval of the exchange by the SLC based on its finding that the lands to be conveyed to Irvine "are no longer useful for navigation, commerce and fishing," the Legislature intended that the SLC should consider the matter, make its findings and approve or not approve the land exchange prior to irrevocable action of the parties in dredging the Irvine lands and filling the tidelands. Since advance consideration by and approval of the SLC was required, the SLC's finding of "uselessness" would necessarily be in futuro. ■ Where a statute is susceptible of two constructions, one of which, in application, will render it harmonious with its manifest purpose and the other which would be productive of absurd consequences, the former construction will be adopted. (*Clements* v. *T. R. Bechtel Co.,* 43 Cal.2d 227, 233 [273 P.2d 5]; *Warner* v. *Kenny,* 27 Cal.2d 627, 629 [165 P.2d 889].)

Appellants attack the existence in the case at bench of virtually every condition set forth in *Mansell* as necessary to a valid exchange of article XV, section 3 tidelands. They contend that the land to be conveyed to Irvine is not to be reclaimed pursuant to a comprehensive, beneficial program of harbor development, arguing first that the Plan does not constitute a comprehensive program and, second, that it is not beneficial. They contend that there has been and can be no valid legislative declaration that the lands to be conveyed to Irvine are "useless" for trust purposes. Under this head, they argue that the finding of "uselessness" by the SLC in 1967 was arbitrary, capricious and unsupported by any evidence and, further, that such finding by the SLC together with its approval of the proposed land exchange are invalid because they have the effect of impairing the power of succeeding Legislatures to administer properly the tidelands trust. They further contend that the lands to be conveyed to Irvine cannot be considered a "relatively small parcel" within the meaning of *Mansell.* It is the last mentioned contention with which we agree. We are not required, therefore, to deal definitively with the other contentions, but, because of the interrelated nature of the issues exposed by these contentions and their effect on our decision, we deem it appropriate to comment on some of them.

The argument that the Plan does not constitute a comprehensive program of harbor development is based primarily on the absence of a binding land utilization plan following the exchange and the absence of any ecological or environmental study. We doubt that in using the words "beneficial program of harbor development" (3 Cal.3d at p. 484), "comprehensive public program of harbor development" (3 Cal.3d at p. 485) and "highly beneficial public program of harbor development" (3 Cal.3d at p. 486), the *Mansell* court meant the word "program" to be interpreted in a technical sense. While section 6373 of the Public Resources Code (added by Stats. 1970, ch. 1555, § 1, p. 3180) now requires the intended recipient of state lands to submit to the SLC and the Legislature a general utilization plan for the lands to be transferred, there was no such specific statutory requirement in 1967. Moreover, as previously noted (see fn. 9, *ante*), the Plan submitted to the SLC was a rather comprehensive document, and appendix VIII thereof was a map showing roadways and general land uses anticipated following the land exchange. By 1967 standards we cannot hold that the Plan did not amount to a "program" within the meaning of *Mansell* on this basis.

We have no doubt that today approval of the land exchange agreement would have to be preceded by an environmental impact study and report pursuant to the California Environmental Quality Act of 1970 (Stats. 1970, ch. 1433 [Pub. Resources Code, § 21000 et seq.] as amended by Stats. 1972, ch. 1154). (Cf. *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal. 3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049].) However, these statutory provisions did not obtain in 1967. Nevertheless, the record of the proceedings of the SLC in 1967 discloses that most, if not all, of the environmental and ecological arguments against the exchange being made today were presented to the Commission at that time. It is no doubt true that the Commission felt that it was faced with a legislative mandate for the creation of a harbor and that ecological and environmental considerations were secondary and more appropriately considered in later stages of the planning. (See e.g., next to last paragraph of fn. 12, *ante*.) In any event, we observe that, were the land exchange otherwise to proceed, it could not do so without approval of the United States Secretary of the Army under the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) who is required to take ecological considerations into account (16 U.S.C. §§ 661-666, particularly § 662(a); 33 C.F.R. § 209.120, pp. 323-324) and who will now undoubtedly be guided by the National Environmental Policy Act of 1970 (42 U.S.C. § 4321, et seq.) and the guidelines promulgated pursuant thereto (36 Fed. Reg. 7724 et seq.) as well as the federal Coastal Zone Management Act of 1972 (Public Law 92-583). Inasmuch as dredging has not been commenced, we think it likely that the requirements of the California Environmental Quality Act of

1970 as amended, *supra,* and even the California Coastal Zone Conservation Act of 1972 (Pub. Resources Code, § 27000 et seq.) would also be applicable. There existed and exist adequate safeguards to preserve ecological values and environmental quality (see *Zabel* v. *Tabb,* 430 F.2d 199), and we cannot hold that because of the absence of an environmental study or report in 1967, the Plan did not constitute a "program" within the meaning of *Mansell.*

With respect to whether or not the Plan would be beneficial to the public, we observe as follows. Although the opinion in *Mansell* several times uses the adjective "beneficial" in conjunction with the word "program" (3 Cal.3d at pp. 484-486), we do not think the court intended thereby to alter the traditional role of the courts so as to have the courts determine in the first instance what is and what is not a public benefit. The courts play a proper role in reviewing legislative actions freeing tidelands from the public trust (*infra*) and in reviewing, under a limited scope of review, the quasi-legislative actions of administrative agencies having the same effect. (*Infra.*) But the question of what is or is not for the public good has traditionally been regarded as a question reserved to the Legislature and its designated agencies. (See e.g., *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control,* 65 Cal.2d 349, 358-365 [55 Cal.Rptr. 23, 420 P.2d 735]; *People ex rel. Dept. Pub. Wks.* v. *Superior Court,* 68 Cal.2d 206, 210 [65 Cal. Rptr. 342, 436 P.2d 342]; *Stevenson* v. *Colgan,* 91 Cal. 649, 651-653 [27 P. 1089]; see also Pub. Resources Code, § 6005.) Moreover, in terms of the utilization of tidelands, the question of what is or what is not beneficial to the public will frequently involve the preference of one trust use over another, and, as we have previously pointed out, that is a legislative question.

In any event, we reject the assertion that the Plan is in reality simply an Irvine real estate promotion. The trial court on ample evidence found to the contrary. The Plan was developed for the purpose of maximizing public use of UNB as a harbor in accordance with a supposed legislative mandate to establish a harbor. It was not undertaken for any private purpose. Rather, the harbor was designed without regard to land ownerships. It was only after the design of the harbor was settled that County, Harbor District and Irvine negotiated the exchange necessary to implement the design. We have no doubt that Irvine would be benefitted by the exchange, but the SLC through its staff found substantial public benefit in the exchange. (See fn. 12, *ante.*) Likewise, the trial court, under the issue of possible impairment of the power of succeeding legislatures properly to administer the trust, received a considerable amount of evidence and made findings of net public benefit similar to, although more precise than, the findings of the SLC staff set forth in footnote 12, *ante.* In addition to the benefits enumerated by the SLC staff,

the trial court found additional public benefit from the exchange in several regards: more navigable water, more usable waterway, better road access, more readily available public access to the water, and more possible tax revenue.

Although the trial court ultimately concluded that the benefits outweighed any possible detriments, it did in its findings recognize several inaccuracies in the findings of the SLC staff and one major detrimental element resulting from the exchange. Inasmuch as these items are important to our discussion of several subsequent issues, we deem it appropriate to set them out at this point.

First of all, the trial court recognized as inaccurate the SLC staff finding that "[t]he area under public jurisdiction is increased from about 400 to 745 acres, an increase of 345 acres or over 86 percent." (Numbered par. 1 in fn. 12, *ante*.) The court recognized that, inasmuch as the patented (Irvine) tidelands were subject to a public easement for navigation, commerce and fishing (see fn. 4, *ante*, and accompanying text) these lands comprising some 243 acres are, in practical effect, under public jurisdiction. Thus, the net gain of lands under public jurisdiction resulting from the exchange (including the 120 acres to be received by County from Irvine to be used only for purposes of statewide interest) is 100.2 acres rather than 345 acres as found by the SLC staff. Moreover, as to tidelands alone, even under its subtracting process (discussion, *infra*), the trial court found a net loss of 10.6 acres.

Secondly, as respects the increase of "waterfront public access . . . from about 6,090 to 17,880 lineal feet" as found by the SLC staff (numbered par. 3 in fn. 12, *ante*) the trial court noted that the present public access is actually in excess of 9,000 lineal feet. It did find, however, that some 3,000 of this 9,000 lineal feet is of questionable utility due, in various places, to no off-street parking, accessibility only by water and limited access.

More importantly, the court found that in its present undeveloped condition UNB has some 53,000 lineal feet of shore line (covered and uncovered by tidewater) exclusive of the shore around the Irvine-owned islands, all of which is subject to public jurisdiction, albeit of limited utility because of limited public access. It found that as a result of the exchange and effectuation of the dredging and filling plan and subsequent bulkheading likely to occur, the public would lose approximately two-thirds of its present shoreline. As a result of the exchange, Irvine would end up with 34,090 lineal feet fronting on the water whereas public frontage would amount to 17,883 lineal feet. After the exchange, of course, there would be much improved access to the 17,883 lineal feet of public water frontage and such frontage would be more usable for certain aquatic purposes.

We turn now to the requirement in *Mansell* that the tidelands to be conveyed must "have been freed of the public trust by legislative act." (3 Cal.3d at p. 484; see also 3 Cal.3d at pp. 485, 486.) Under the common law tidelands trust doctrine, it is widely recognized that, if in the course of the proper administration of the trust for trust purposes, e.g., a program of harbor development, lands have been filled and reclaimed so that they are rendered "useless" for trust purposes, the Legislature in whose hands administration of the tidelands trust rests, may by legislative act declare such lands "useless" for trust purposes and convey them free of the public trust. (E.g., *Illinois Cent. R. R.* v. *Illinois, supra,* 146 U.S. at pp. 452, 455-456 [36 L.Ed. at pp. 1042, 1043, 13 S.Ct. at pp. 117-118, 119]; *People* v. *California Fish Co., supra,* 166 Cal. at pp. 585, 597; *Atwood* v. *Hammond, supra,* 4 Cal.2d at pp. 41-42; *Marks* v. *Whitney, supra,* 6 Cal.3d at p. 260; see also Note, *supra,* 22 Hastings L.J. at pp. 766-767.) In respect to the common law tidelands trust doctrine it is also frequently said that such legislative determination is conclusive upon the courts unless it has the effect of substantially impairing "the public interest in the lands and water remaining" (*Illinois Cent. R. R.* v. *Illinois, supra,* 146 U.S. at pp. 452, 456, 460 [36 L.Ed. at pp. 1042, 1043, 1045, 13 S.Ct. at pp. 117-118, 119, 121]; *Boone* v. *Kingsbury,* 206 Cal. 148, 183 [273 P. 797]) or of impairing "the power of succeeding legislatures to protect, improve and develop the public interest in commerce, navigation and fisheries" (*Mallon* v. *City of Long Beach, supra,* 44 Cal.2d at p. 207; *Oakland* v. *Oakland Water Front Co.,* 118 Cal. 160, 185 [50 P. 277]; *Boone* v. *Kingsbury, supra.*)[16] These principles applicable to the common law trust doctrine were incorporated wholesale into the California constitutional tidelands trust law by *Mansell.* (3 Cal.3d at pp. 482-486; see also Note, *supra,* 22 Hastings L.J. 766-768.)

We do not think it is seriously contended by any party that the enabling act (Stats. 1957, ch. 2044) was intended to or had the effect of freeing from the public trust the tidelands proposed to be conveyed to Irvine in the land exchange agreement here under consideration, at least as to those tidelands which had not then been filled and reclaimed. While, as we have heretofore indicated, a declaration of "uselessness" in futuro may be appropriate, no such binding legislative declaration could be made in the absence of a meaningful plan for the proposed harbor development. (Cf. *People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville, supra,* 69 Cal.2d at pp. 545-547.) Chapter 2044 was enacted in 1957. The Plan was not settled upon until 1964, and the land exchange agreement was not entered into until 1965. Quite obviously, as respects the tidelands to be filled and reclaimed in the

---

[16]The last mentioned principle will hereinafter sometimes be referred to as the impairment doctrine.

future, chapter 2044 constitutes simply a delegation of legislative authority to the SLC to make the necessary finding of "uselessness" when the plan of harbor development and the land exchange agreement had been fully formulated by County, Harbor District and Irvine. The SLC was, in effect, so advised by lengthy memorandum from the Attorney General's office prior to its proceedings in 1967.[17]

We come, then, to the action of the SLC in 1967 approving the exchange. We have heretofore considered and rejected appellants' contention that the SLC's finding of "uselessness" was invalid because phrased in the future tense. (See text following fn. 15, *ante*.) Appellants also attack both the finding of "uselessness" and the finding of "at least equal value" on the grounds that they were made arbitrarily, capriciously and wholly without evidentiary support.

As we have previously observed, administration of the tidelands trust is a legislative function. We think it beyond question that the determinations of the SLC pertaining to administration of the trust pursuant to an express delegation of authority from the Legislature must be classified as quasi-

[17]The Attorney General's memorandum dated July 31, 1967 was introduced as petitioners' exhibit 70-R. Following are pertinent excerpts therefrom.

"2. Chapter 2044 vests in the Commission discretionary authority to examine the proposed transaction as a whole in order to determine whether the proposed conveyance of granted lands free of the public trust is in the best interests of the State. . . .

"3. The three determinations which must be made by the Commission are (a) whether it should give or withhold its approval of and concurrence in the proposed conveyance; (b) whether the lands to be conveyed are no longer useful for navigation, commerce and fishing; and (c) whether the lands to be received in exchange are at least of equal value to those conveyed.

" . . . . . . . . . .

"5. The legislative finding that certain presently unfilled tidelands will no longer be required for navigation, commerce and fishery applies only to lands as to which the Commission shall make a similar finding. The legislative finding does not relieve the Commission of responsibility for making an independent examination of pertinent facts and the application of established criteria. The Commission's finding should be based upon physical conditions as of the date of actual conveyance, i.e., after the lands to be conveyed have been filled and the designated private lands have been dredged to create navigable channels. The finding should take into consideration all presently predictable future needs in the area in question, with special emphasis upon any necessity to retain any portions of the lands to be conveyed for adequate public access to the harbor and the possible future need by public agencies to utilize any portions of such lands for navigational structures such as wharves, piers and docks."

The duty to consider future trust-purpose needs was elaborated on in another portion of the memorandum. The memorandum also advised the Commission that the patented (Irvine) tidelands were subject to a public easement for commerce, navigation and fisheries which would permit the administrator of the trust to enter upon and possess these lands for such purposes. It further stated: "Although present decisions do not clearly define the precise purposes for which such lands may be used without compensation, it is established that these include the dredging of such lands for harbor purposes. *Newcomb* v. *City of Newport Beach,* 7 Cal.2d 393, 400, 401, 402 (1936)."

legislative in character. ■ It is established that in reviewing quasi-legislative actions of administrative agencies the scope of judicial review is limited to an examination of the proceeding before the agency to determine whether its actions have been arbitrary, capricious or entirely lacking evidentiary support, or whether it has failed to follow the procedure or give the notices required by law. (*Pitts* v. *Perluss,* 58 Cal.2d 824, 833-835 [27 Cal.Rptr. 19, 377 P.2d 83]; *Ray* v. *Parker,* 15 Cal.2d 275, 303-312 [101 P.2d 665]; *Brock* v. *Superior Court,* 109 Cal.App.2d 594, 603-606 [241 P.2d 283].) The trial court, of course, found that the action of the SLC in 1967 was not arbitrary, capricious nor unsupported by the evidence. The scope of review of the SLC's action, however, is the same in this court as it was in the trial court, and we are, therefore, not bound by the trial court's findings in this regard. (Cf. *Bixby* v. *Pierno,* 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242]; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control,* 2 Cal.3d 85, 94-95 [84 Cal.Rptr. 113, 465 P.2d 1]; *Merrill* v. *Department of Motor Vehicles,* 71 Cal.2d 907, 916 [80 Cal.Rptr. 89, 458 P.2d 33].)

Appellants' attack on the finding of "at least equal value" is based on their contention that the three Irvine-owned islands were grossly overvalued because, as a practical matter, they could not have been developed as allegedly planned by Irvine because of lack of access for bridging. Suffice it to say that this very point was brought to the attention of the SLC at the 1967 hearing by one of the persons who spoke, and the finding as to valuation finds ample support in the record of the SLC proceedings.

Appellants' attack on the "uselessness" finding is more complex. In the first place, they contend that, inasmuch as the lands to be conveyed to Irvine front on the water and, in many instances, are practically at water level, it is impossible to say that they are useless for trust purposes. This argument is based on the premise that a finding of "uselessness" can only be made if the lands involved are actually useless for trust purposes. This premise is unsound. As heretofore pointed out the principles concerning legislative findings of "uselessness" in the constitutional tidelands trust context were borrowed from the common law tidelands trust doctrine. The cases decided under the common law trust doctrine appear to employ the term "useless"[18]

---

[18]Actually, although we have throughout this opinion used the term "uselessness," the cases use several words and phrases interchangeably. *People* v. *California Fish Co., supra,* speaks of lands that "are no longer useful for navigation" (166 Cal. at p. 585) and "unavailable for navigation" (166 Cal. at p. 597). *Knudson* v. *Kearney, supra,* at one point speaks of "tide-lands considered unnecessary for purposes of navigation" (171 Cal. at p. 253). The finding approved in *Atwood* v. *Hammond, supra,* 4 Cal. 2d at pp. 42-43 was " 'not longer required for navigation, commerce or fisheries.' " Indeed, *Mansell* itself speaks of lands "of no value for navigational and related purposes" (3 Cal.3d at p. 485) and lands "valueless for trust purposes" (3 Cal.3d at p. 486).

in terms of relative utility. (See e.g., *Atwood* v. *Hammond, supra,* 4 Cal.2d 31; *Knudson* v. *Kearney, supra,* 171 Cal. 250; *People* v. *California Fish Co., supra,* 166 Cal. 576; see also *City of Milwaukee* v. *State, supra,* 193 Wis. 423.) Indeed, in the *Mansell* case in which the court was dealing with article XV, section 3 tidelands, it does not appear that the tidelands to be conveyed were absolutely useless for trust purposes. The court spoke of the 8.5 acres to be received in exchange as being "of such a configuration that they can be used more effectively by the city and state in furtherance of public trust purposes [than the filled tidelands to be conveyed]." (3 Cal.3d at p. 477.) Given the expanded and expanding concept of permissible trust uses (see *Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 259-260), it would be virtually impossible ever to find land contiguous to navigable water useless for trust purposes in an absolute sense.

We have thoroughly studied the record as it relates to the proceedings of the SLC and, candidly, we do have some misgivings concerning them. In the first place, as we have previously observed and as is reflected in the trial court's more precise findings, the findings and conclusions of the staff presented to the Commission were inaccurate in several respects. The staff's finding that the area presently under public jurisdiction is only about 400 acres (numbered par. 1 in fn. 12, *ante*) as well as the executive officer's statements at the public hearing indicate that the staff may have given too little weight to the nature and extent of public easement over the patented (Irvine) tidelands. There were also statements made by one or more members of the Commission at the hearing indicating that they were inclined to defer to some extent to the judgment of the Orange County Board of Supervisors which, of course, had approved the Plan and the land exchange. Most importantly, there appears to have been made no actual study of the possible trust uses to which the lands to be conveyed to Irvine could otherwise have been put. Indeed, there was precious little discussion of the utility of these lands for trust purposes at all, and, at one point during the public hearing the executive officer stated: "Patently, a parcel of land that is filled to several feet above mean high waterline can no longer be useful for commerce, navigation and fishing."

We think it fair to summarize the attitude of the Commission as follows. They felt that there had been a legislative mandate for the establishment of a harbor. Many years had passed and no harbor had been developed. Irvine's uplands surrounding UNB were being developed and Irvine had indicated its intention to develop the islands in the channel if the exchange were not approved, which necessitated immediate action by the Commission. It was recognized that the Plan was not the ideal solution and that a completely publicly owned harbor would be preferable, but it had been determined that funds were not available then or in the then foreseeable future for condem-

nation of the Irvine properties. The Commission had refused to approve the exchange the preceding year so that alternative plans might be considered. No such feasible alternative plan had been presented. The property to be received was at least of equal value to that to be conveyed, and the Plan and land exchange would constitute an improvement from the public standpoint over the existing conditions and, therefore, the exchange should be approved. Having so decided, the Commission made the requisite findings.

On the other hand, the Commission had before it the Plan (described in fn. 9, *ante*) which included scaled maps and diagrams of the present ownerships and the lands to be exchanged, including their sizes and irregular shapes. The Commission also had before it the product of extensive staff investigations and studies as well as the report of an independent consultant, and the Attorney General's memorandum of July 31, 1967 (see fn. 17, *ante*). Further, the record indicates that several members of the staff and perhaps one or more of the Commission members had personally made inspections of UNB.

■ In exercising the limited scope of judicial review of the quasi-legislative actions of administrative agencies, a court may not reweigh the evidence and substitute its judgment for that of the agency nor may it inquire into the soundness of the reasoning by which the agency's conclusions were reached. (*Ray* v. *Parker, supra,* 15 Cal.2d at pp. 303-312, particularly p. 305; *Brock* v. *Superior Court, supra,* 109 Cal.App.2d at pp. 603-606.) ■ In face of the express findings made by the SLC, we cannot say it failed to exercise its discretion, and under the applicable principles of the existing law as to the limited scope of judicial review, we cannot say that the SLC's action in 1967 was arbitrary, capricious or entirely lacking in evidentiary support. There is, of course, no hint of any fraud or corruption.[19]

[19]Appellants stress, of course, that the action of the SLC in 1967 was completely contrary to its findings and action in 1966 (see fn. 11, *ante*). The facts presented to the Commission in 1966 were, at least, conflicting, and we know of no prohibition against an administrative agency changing its decision in this way when the facts before it are in conflict. Moreover, although the Commission declined to approve the exchange in 1966, it did so for the express purpose of allowing consideration of alternative plans. In the ensuing year, alternatives were investigated by the staff with negative results. Additionally, the executive officer testified at trial that some of the staff's conclusions in 1966 were based on two erroneous assumptions: that the new channel was to be only 300 feet wide and that the determination of "uselessness" was to be made with respect to the tidelands in their present condition.

We do not read *Bixby* v. *Pierno, supra,* 4 Cal.3d 130 as changing the scope of review in respect to quasi-legislative determinations of administrative agencies. (See 4 Cal.3d at p. 137, fn. 2.) In view of the extraordinary nature of the tidelands trust doctrine, however, and particularly in cases involving the California constitutional tidelands trust, it might well be questioned whether the limited scope of review established by

■ The question remains whether the 1967 action of the SLC is invalid under the impairment doctrine (see fn. 16, *ante,* and accompanying text). The question is whether freeing the tidelands to be conveyed to Irvine from the public trust and conveying them to Irvine will have the effect of substantially impairing "the public interest in the lands and water remaining" (*Illinois Cent. R. R.* v. *Illinois, supra,* 146 U.S. at pp. 452, 456, 460 [36 L.Ed. at pp. 1042, 1043, 1045]; *Boone* v. *Kingsbury, supra,* 206 Cal. 148, 183) or impairing the "power of succeeding legislatures to protect, improve and develop the public interest in commerce, navigation and fisheries" (*Mallon* v. *City of Long Beach, supra,* 44 Cal.2d at p. 207; *Oakland* v. *Oakland Water Front Co., supra,* 118 Cal. 160, 185; *Boone* v. *Kingsbury, supra; City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 482 [fn. 17], 486). Appellants argue that conveyance of the tidelands free of the public trust to Irvine will obviously impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes because those lands, which are contiguous to the water and, in many instances, practically at water level and which are patently useful for trust purposes, will by their conveyance free of the trust be gone forever. In part, this contention rests upon appellants' concept of absolute uselessness which we have already rejected. We are troubled, however, by the fact that of the shoreline now completely under public control, albeit of limited access, the public will in the exchange retain only about one-third of the shoreline, whereas two-thirds of the shoreline will end up in private ownership. (Cf. *Illinois Cent. R. R.* v. *Illinois, supra,* 146 U.S. 387; but cf. *Oakland* v. *Oakland Water Front Co., supra,* 118 Cal. at p. 185.) Respondents argue that in testing for impairment, it must be borne in mind that it is within the province of the Legislature to prefer one trust use over another and that in respect to development of a harbor in UNB (the legislatively preferred use in this case), the exchange not only does not impair the power of succeeding legislatures to administer the trust, but, indeed, enhances such power.

The words "impair the public interest in the lands and water remaining" and "impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes" are in themselves not very

---

*Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 833 and *Ray* v. *Parker, supra,* 15 Cal.2d at pp. 303-312 is appropriate. (Cf. Sax, *supra,* 68 Mich.L.Rev. at pp. 542-543, 557-565.) Certainly some of the rationale in the majority opinion in *Bixby* v. *Pierno, supra,* 4 Cal.3d at pp. 141-144 would appear to be germane. We, of course, as an intermediate appellate court, are not at liberty to disregard the established scope of review as set forth in *Pitts* v. *Perluss, supra,* and *Ray* v. *Parker, supra.* We should say, however, that, even were we at liberty to do so, we should decline at least for the present. It appears to us that the numerous changes in the law relating to ecological and environmental matters since 1967 (e.g., enactment of the California Environmental Quality Act [Pub. Resources Code, § 21000 et seq.]) would make highly unlikely today the recurrence of the attitudes and procedures in the SLC of which we have been critical in the text.

meaningful. Generally, the meaning of broad language of this nature may be ascertained from decisions applying the language to specific facts. While numerous cases use the language, the only one of the many cases brought to our attention in which the language has been applied is *Illinois Cent. R. R.* v. *Illinois, supra,* 146 U.S. at pp. 452, 456, 460. (Cf. *Priewe* v. *Wisconsin State Land & Improvement Co.,* 93 Wis. 534 [67 N.W. 918].) In the *Illinois* case the United States Supreme Court invalidated a grant by the Illinois Legislature to the railroad company comprising virtually the whole commercial waterfront of the City of Chicago including all the land underlying Lake Michigan for a distance of one mile from the shoreline. The court appears to have been concerned with the size of the grant, the fact that it was apparently not made for purposes of aiding navigation, commerce or fishing and that the grant had no public purpose nor benefit. (See Sax, *supra,* 68 Mich.L.Rev. at pp. 489-491; Note, *supra,* 22 Hastings L.J. at pp. 762-763.) While, as previously stated, we are concerned under this head with the size of the conveyance to Irvine, particularly in terms of waterfrontage, the exchange here proposed is, as heretofore set forth, part of a program of harbor development in furtherance of a permissible trust use and would, as found by the SLC, result in public benefit. Under these circumstances we do not think the 1967 action of the SLC can be said to be invalid under the impairment doctrine. (Cf. *Oakland* v. *Oakland Water Front Co., supra,* 118 Cal. at pp. 184-185.)

 We come at long last to what we view as the controlling issue. It will be remembered that one of the conditions set forth in *Mansell* as a prerequisite to a permissible exchange of article XV, section 3 tidelands was that the tidelands to be exchanged constitute "a relatively small parcel" (3 Cal.3d at pp. 485, 486). The trial court adopted both a finding of fact and a conclusion of law that the lands to be conveyed to Irvine in the exchange constitute a "relatively small parcel" within the meaning of *Mansell.* The acreages and lineal feet of waterfrontage involved, of course, are factual determinations by which we are bound if founded on substantial evidence. Whether these areas and distances constitute a "relatively small parcel" within the meaning of *Mansell,* however, is properly a conclusion of law subject to our determination. We have concluded that the lands to be conveyed to Irvine under the land exchange agreement do not constitute a "relatively small parcel" within the meaning of *Mansell.*

The following acreage and percentage figures are taken from the trial court's findings.[20] County presently owns the granted tidelands comprising 403.7 acres together with the easement for public trust purposes over Irvine's patented tidelands comprising 243 acres. From the granted tidelands (403.7

---

[20]These figures appear to exclude the 8.1 acres owned by Harbor District and known as Coney Island (see fn. 6, *ante*), which we deem immaterial to this issue.

acres) County is to convey to Irvine 97.9 acres, equivalent to 24 percent of the original granted tidelands. Of Irvine's patented tidelands, encumbered with the easement for public trust purposes (243 acres), Irvine is to convey to County the fee interest in 183.8 acres and County is to release from the easement for public trust purposes 59.2 acres, equivalent to 24 percent of the patented tidelands. On the other hand, Irvine is to convey to County to be dredged and become part of the channel contiguous uplands and portions of its three islands, totaling 146.5 acres. In addition, Irvine is to convey to County an additional 120 acres of its fee-owned uplands, primarily for parks and access.

In finding and concluding that the tidelands to be conveyed to Irvine constitute a relatively small parcel, the court computed the net acreage of the granted (County) tidelands to be conveyed to Irvine and the easement over the patented (Irvine) tidelands to be released to Irvine to be 10.6 acres, equivalent to 1.6 percent of the total combined acreage of the granted tidelands and the patented tidelands. In so doing, it offset against the 97.9 acres of granted (County) tidelands to be conveyed to Irvine and the 59.2 acres of patented (Irvine) tidelands as to which the easement is to be released, the 146.5 acres of uplands (consisting of contiguous uplands and portions of Irvine's three islands) to be conveyed by Irvine to County and to be dredged away to form the channel. In other words, the court subtracted from the total acreage to be conveyed to Irvine only the acreage of the lands being conveyed by Irvine to County that are to be dredged and become part of the harbor. The court did not subtract the additional 120 acres of uplands contiguous to UNB to be conveyed by Irvine to County nor the fee title to the 183.8 acres of patented tidelands (encumbered by the easement for public trust purposes) to be conveyed by Irvine to County.

Appellants contend that the subtraction process utilized by the trial court was not contemplated by and is impermissible under *Mansell*. They correctly point out that the language "relatively small parcel" was borrowed by the *Mansell* court from *Atwood* v. *Hammond, supra,* 4 Cal.2d at page 43. (See *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 484-485.) They urge that this terminology was used in *Atwood* to mean a small part of the original grant by the State to the subordinate public agency. (See *Atwood* v. *Hammond, supra,* 4 Cal.2d at p. 41: "it was competent for the state by legislative action to terminate this public trust as to the 18-acre parcel, which constitutes but a *small part of the area granted to the city*." [Italics supplied.]) They urge that the proposed land exchange calls for conveyance to Irvine of 24 percent of the granted tidelands and, coincidentally, release of the public easement over the patented tidelands of 24 percent, and that such conveyance and release, involving 157.1 acres of article XV, section 3 tidelands

cannot be considered a "relatively small parcel" within the meaning of *Mansell*. They further point out that the *Mansell* court did not employ any subtracting process such as is advocated in the case at bench. As previously pointed out, the exchange approved in *Mansell* involved 5 acres of filled, reclaimed tidelands for 8.5 acres of McGrath lands. Had the *Mansell* court employed a subtraction process, the result would have been a net gain to the public agencies of 3.5 acres. In this connection, appellants point out the restrictive language in the *Mansell* opinion: "But we emphasize that the circumstances under which this may occur are of necessity unique, that the conditions sanctioning its approval must be scrupulously observed and satisfied, and that generally speaking the reclaimed area alleged to be free from both the public trust and the constitutional restriction against alienation into private ownership must be, as it were, a residual product of the larger program—a 'relatively small parcel' to use the language of *Atwood* (4 Cal.2d at p. 43)—determined by the Legislature to have no further value for the purposes of the public easement." (3 Cal.3d at p. 485.)

Respondents, on the other hand, point out that in its reiteration of its holding, the *Mansell* court used the language "if they [the tidelands to be conveyed] constitute a relatively *small parcel of the total acreage involved*" (3 Cal.3d at p. 486; italics supplied) and urge that this language supports the "net result" approach advocated by respondents.[21] Respondents suggest that one explanation for the *Mansell* court's not employing any subtraction process might be that the 8.5 acres of McGrath lands were not themselves filled tidelands and that any subtraction process would, therefore, have been in-

---

[21]Actually, in respect to the "relatively small parcel" issue, the *Mansell* court used different terminology, apparently interchangeably, at three different points: "relatively small in area" (3 Cal.3d at p. 484); "a residual product of the larger program—a 'relatively small parcel' to use the language of *Atwood*" (3 Cal.3d at p. 485); and "a relatively small parcel of the total acreage involved" (3 Cal.3d at p. 486). We are hard put to know exactly what our high court had in mind particularly in view of the court's statement at 3 Cal.3d at p. 485: "Although these cases [the San Francisco Bay cases] do not concern themselves with the application of article XV, section 3—that provision not being in existence at the time of the transfers there in question—the material which we have quoted proceeds in light of those cases and clearly indicates that article XV, section 3, would not have forbidden those transfers." As previously noted (see fn. 15, *ante*), we view this statement in *Mansell* as unnecessary to the decision and, thus, a dictum (see *Achen* v. *Pepsi-Cola Bottling Co.*, 105 Cal.App.2d 113, 124-125 [233 P.2d 74]) not binding upon us. (*People* v. *Gregg, supra*, 5 Cal. App.3d at p. 506; *Hess* v. *Whitsitt, supra*, 257 Cal.App.2d at p. 556; see 6 Witkin, Cal. Procedure (2d ed.), *supra*, pp. 4589-4591.) The San Francisco Bay tidelands transaction involved cutting off a large area of tidelands and submerged lands to be filled, reclaimed and sold free of the public trust. This area now constitutes a large portion of the business section of San Francisco. (See *People* v. *California Fish Co., supra*, 166 Cal. at pp. 585-586; *Knudson* v. *Kearney, supra*, 171 Cal. at pp. 251-252.) We are unable to see how this transaction could meet the "relatively small parcel" criterion laid down in *Mansell*.

appropriate in *Mansell*. We cannot be certain whether the 8.5 acres of McGrath lands to be received by the public agencies in *Mansell* were filled tidelands, but the implication in the opinion is that they were. They were identified in the opinion as a portion of the "section 2(b)" lands, which were filled, reclaimed tidelands (3 Cal.3d at p. 474) and it was noted that they "abut either water or existing public trust facilities" (3 Cal.3d at p. 477).

More persuasively, however, respondents appeal to reason. They emphasize that the trial court deducted only the acreage of those parcels which were to be conveyed by Irvine to County to be dredged away to form part of the channel. When so dredged these lands would be in fact submerged lands and, thus, become subject to the public trust for navigation, commerce and fishing. (See Pub. Resources Code, § 6307; cf. *The Robert W. Parsons* [*Perry* v. *Haines*], 191 U.S. 17, 26-28 [48 L.Ed. 73, 77-78, 24 S.Ct. 8, 10-11]; *Bohn* v. *Albertson,* 107 Cal.App.2d 738, 743 [238 P.2d 128].) While, technically, we might be on firm ground in rejecting outright this subtraction process, for we do not believe any such process was envisioned in *Mansell*, nevertheless, we are reluctant to do so, for where, as here, the subtracted lands will themselves be tidelands or submerged lands, the appeal to logic is irresistible, and we can envision other situations in which such a subtraction process might prove a useful judicial tool.

Even if we accept the advocated subtraction process, however, we think there is another dimension to the "relatively small parcel" criterion that precludes classifying the lands to be conveyed to Irvine in the proposed exchange as a "relatively small parcel" within the meaning of *Mansell*. That dimension relates to the shoreline. At the present time through County's ownership in trust of the granted tidelands and its control over the public easement in the patented tidelands, the public has control of all of the shoreline of UNB. We recognize that, at present, access to the shoreline is limited and that the shoreline is in many places covered and uncovered by the ebb and flow of the tide limiting its utility. Nevertheless, the public does presently control the entire shoreline, and as a result of the exchange it would be relinquishing two-thirds of the shoreline to be conveyed into private ownership. We do not believe that in formulating the "relatively small parcel" criterion, the *Mansell* court meant to countenance public relinquishment of two-thirds of the shoreline of an entire bay. We fully recognize that the trial court found the public benefits to outweigh this detriment, but it must ever be borne in mind that in dealing with the conveyance of article XV, section 3 tidelands, it is not benefit with which we are concerned; it is constitutionality.

Thus, we are influenced in reaching our decision not only by the restrictive language of *Mansell* but, also, by a number of considerations funda-

mental to the proper operation of our tripartite system of constitutional government. Perhaps the unique genius of our system lies in the obligation of the judicial branch of government to enforce the provisions of the Constitution even as against legislative and executive actions. (E.g., *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 175-178 [2 L.Ed. 60, 72-74]; *Bixby v. Pierno, supra,* 4 Cal.3d at p. 141 and authorities there cited; see also Wright, *The Role of the Judiciary: From Marbury to Anderson,* 60 Cal. L.Rev. 1262.) In exercising this function, however, there is an essential corollary principle that must be observed by the judicial branch if our tripartite system of constitutional government is to be preserved, the principle of judicial restraint.

There are, however, at least two aspects to the doctrine of judicial restraint. One, perhaps the best known, relates to judicial deference to legislative and executive actions in questionable cases. (See e.g., *In re Lynch,* 8 Cal.3d 410, 414-415 [105 Cal.Rptr. 217, 503 P.2d 921]; *People* ex rel. *Dept. Pub. Wks.* v. *Superior Court, supra,* 68 Cal.2d at p. 210.) ▮ A legislative or executive act is not to be held unconstitutional simply because the court disagrees with its desirability. (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d at p. 364.) Another aspect of this doctrine, perhaps less well known and certainly less recognized in recent years, is the obligation of courts not to read constitutional provisions in or out of the Constitution under the guise of interpretation, no matter how desirable or expedient such action might appear to be at the moment. "That might result in a benevolent despotism if the judges were benevolent men. It would put an end to the reign of law." (Cardozo, The Nature of the Judicial Process (1921) p. 136.) Put another way, the provisions of the Constitution are binding upon every department of government: legislative, executive *and judicial.* (See *People* v. *California Fish Co., supra,* 166 Cal. at p. 587.)

▮ Applying these principles to the case at bench, we observe that the prohibition of article XV, section 3 against the alienation of tidelands within two miles of an incorporated city was incorporated into the California Constitution of 1879 after extended debate and for the specific purpose of withdrawing from the Legislature the power to sell such tidelands as was its wont in prior years notwithstanding an already existing similar statutory prohibition (Stats. 1869-1870, ch. 573, § 70, pp. 877-878; see *San Pedro etc. R. R. Co.* v. *Hamilton,* 161 Cal. 610, 618 [119 P. 1073]; *People* v. *Kerber, supra,* 152 Cal. at p. 735). (See *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 478-479, 504, et seq. [appendix B]; Note, *supra,* 22 Hastings L.J., *supra,* at pp. 763-765; cf. Dyer, *California Beach Access: The Mexican Law and the Public Trust,* 2 Ecology L.Q. 571

578-580 [discussing contemporaneous adoption of Cal. Const., art. XV, § 2].) In view of the purpose of and the circumstances surrounding the adoption of article XV, section 3, it is the judicial function of enforcing its prohibition and that aspect of the doctrine of judicial restraint by which we are obliged not to read the prohibition out of the Constitution under the guise of interpretation that must prevail. (Cf. *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 478-479, 481.)

It is not for us to question the wisdom of including such an absolute prohibition in the Constitution. Although it seems to us arguable that the prohibition contained in article XV, section 3 was not intended to apply at all to publicly beneficial land exchanges as contrasted with outright sales, that question is not argued by the parties and, in any event, is foreclosed to us by the *Mansell* decision which held the constitutional provision applicable to such an exchange. Given the constitutional prohibition and its applicability, and given the formulation in *Mansell,* and given that it is the legislative branch of government whose province it is to prefer one trust use over another, and given the limited purview of the impairment doctrine, and given the limited scope of review available to the courts in reviewing quasi-legislative actions of the SLC, we see no alternative to strictly construing the term "relatively small parcel" as used in *Mansell.* Should we call small that which in terms of its public effect is not small, we should abrogate the essential judicial function of enforcing the Constitution and violate that aspect of the equally essential doctrine of judicial restraint which requires us to refrain from altering the Constitution by which we, too, are bound, under the guise of interpretation and for the sake of apparent contemporary benefit and expediency.

The judgment is reversed. The trial court is directed to enter judgment denying the peremptory writ of mandate, discharging the alternative writ heretofore issued by it and awarding costs in accordance with law bearing in mind that the recovery of costs against the State in this action is prohibited by Public Resources Code, section 6308. In view of this prohibition against the recovery of costs against the State, it is hereby ordered in the interests of justice that Interveners shall recover their costs on appeal from respondent Irvine and that appellant Heim, as Auditor of Orange County, shall bear his own costs on appeal. (Cal. Rules of Court, rule 26(a).)

Kerrigan, J., and Gabbert, J., concurred.

Petitions for a rehearing were denied March 12, 1973, and the opinion was modified to read as printed above.