TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 98-503 |
| of | : | |
| | : | September 14, 1998 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY M. SUMMERS | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE LOUIS B. GREEN, COUNTY COUNSEL, COUNTY OF EL DORADO, has requested an opinion on the following questions:

1.     Is an historic Gold Rush "pioneer" cemetery that was dedicated to public use subject to the management and control of a county board of supervisors pursuant to (1) chapter 8 of the Statutes of 1854, (2) chapter 267 of Statutes of 1859, (3) chapter 73 of the Statutes of 1868, (4) former Political Code section 3105, (5) Civil Code section 1007, or (6) Health and Safety Code sections 8825-8829?

2.     What are the rights of members of the public to visit an historic Gold Rush "pioneer" cemetery dedicated to public use that is under the management and control of a county board of supervisors?

CONCLUSIONS

1.     An historic Gold Rush "pioneer" cemetery that was dedicated to public use is subject to the management and control of a county board of supervisors if it is located in unincorporated territory and was acquired or dedicated as a public cemetery pursuant to present or preexisting law and such use has not been terminated.

2.     The rights of members of the public to visit an historic Gold Rush "pioneer" cemetery dedicated to public use that is under the management and control of a county board of supervisors are subject to reasonable regulations adopted by the county board of supervisors to protect public peace and safety.

ANALYSIS

We are informed that numerous "pioneer" cemeteries are located in the Gold Rush area of the state **Footnote No. 1** which visitors to the area are interested in viewing. We are asked whether a county is responsible for the management and control of such cemeteries within its boundaries and whether members of the public have an unrestricted right to visit these historical sites. We conclude generally that Gold Rush "pioneer" cemeteries are under the management of a county and that members of the public may visit the cemeteries subject to reasonable regulations adopted by the county board of supervisors.

1.      Management Responsibilities

A cemetery is either public or private, depending upon its ownership. (Health & Saf. Code. §§ 8250, 8250.5.) **Footnote No. 2** A public cemetery that is not owned by a city or fraternal or beneficial association is under the jurisdiction and control of the board of supervisors of the county where it is located. (§ 8131.)

In addressing the management responsibilities of a county with respect to historic "pioneer" cemeteries, we are asked to examine specifically a number of statutory schemes adopted by the Legislature since California became a state in 1850.

A. Chapter 8 of the Statutes of 1854

Our inquiry commences with chapter 8 of the Statutes of 1854 ("Chapter 8"), which provides in part:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Sec. 3. When grave yards are located on the public lands they shall not contain more than an area of five acres.

"Sec. 4. Where the bodies of six or more persons are buried, it is hereby declared a public grave yard."

It is evident that Chapter 8 did not alter the title to any land being used as a "public grave yard." In *City of Stockton* v. *Weber* (1893) 98 Cal. 433, the court ruled that under Chapter 8, title to the property remained unchanged by permitting use of the land for cemetery purposes and that the land was held "subject to" that use, so long as it continued. (*Id.,* at pp. 437-438.)

We believe that Chapter 8 merely sanctioned continued cemetery use of land that was utilized as a "public grave yard." It neither transferred title to the land nor created any management responsibilities on the part of county governments.

B. Chapter 267 of the Statutes of 1859

In 1859 the Legislature adopted "An act to Authorize the Incorporation of Rural Cemetery Associations." (Stats. 1859, ch. 267; "Chapter 267.") Under Chapter 267, cemetery associations were authorized to establish and operate cemeteries, selling plots to members of the public. We have previously considered the question whether a cemetery association formed pursuant to Chapter 267 was "a public cemetery." In 17 Ops.Cal.Atty.Gen. 176, 178 (1951), we concluded that it was not:

" . . . [W]hile the maintenance of a cemetery is certainly a matter in which the public is interested, as it is interested in any other private undertaking involving the public health, welfare and morals, nevertheless the rights and obligations arising out of the operation of a cemetery association are private matters."

Chapter 267 did not create public cemeteries over which county governments would exercise any management authority. The fee title to the cemetery remained in the association that formed it. Indeed, the purchaser of a cemetery plot obtained only a right to use the plot for cemetery purposes so long as such use was permitted by appropriate government authority. Upon withdrawal of such approval, the cemetery could be required to remove any bodies and discontinue the use. Since the purchaser of a plot did not have any title to it, the purchaser's private rights and obligations with respect to the cemetery association were unimpaired by governmental action terminating the cemetery use. (*Hornblower* v. *Masonic Cemetery Assn.* (1923) 191 Cal. 83.)

C. Chapter 523 of the Statutes of 1868

In 1868 the Legislature enacted a statutory scheme (Stats. 1868, ch. 523; "Chapter 523") to implement federal law relating to the use of federal public lands. Chapter 523 authorized county judges to file claims to federal public lands on behalf of and in trust for the local inhabitants. A county judge was to cause a survey to be made, designating privately claimed lots and parcels and "all streets, roads, lanes, and alleys, public squares, churches, school lots, cemeteries and commons, *as the same exist and have heretofore been dedicated in any manner to public use*." (Stats. 1868, ch. 523, § 3; italics added.) Of particular relevance to the present inquiry was section 5 of Chapter 523:

"All streets, roads, lanes, and alleys, public squares, churches, school lots, cemeteries and commons, surveyed, marked and platted on the map of any town site, as prescribed and directed by the provisions of this Act, shall be deemed and considered, and they are hereby declared to be, dedicated to public use, by the filing of such town plat in the office of the County Recorder, and shall be inalienable, unless by special order of the Board of Supervisors of the county, so long as such town shall remain unincorporated; and if the town shall at any time hereafter become incorporated, then the same shall become the property of such town or city, and shall be under the care and subject to the control of the . . . municipal authority of such town or city."

Chapter 523 recognized various dedications of land for public uses, provided such uses had been established prior to the making of the survey. Chapter 523 did not establish or impose new dedications of land. Accordingly, if a cemetery existed on federal public lands prior to 1868 and had been dedicated to public use, that use was recognized and continued by Chapter 523 when

the land was transferred to a county judge, provided the cemetery was shown on the plat map and the map was filed with the county recorder. The public dedication would be terminated only by appropriate subsequent action of the county or city government having jurisdiction over the cemetery.

Chapter 523 was repealed in 1937 (Stats. 1937, ch. 221, § 1); however, its repeal had no effect on rights that had become vested prior to that time. Any cemeteries that were dedicated to public use prior to 1868, identified on surveys of lands claimed by a county judge pursuant to federal law and Chapter 523 with a plat map being filed with the county recorder, would continue to be public cemeteries under management and control of a city or county unless abandoned or sold by the governmental authority.

D. Former Political Code Section 3105

In 1872 the Legislature enacted former Political Code section 3105 ("Section 3105") as follows:

"The title to lands used as a public cemetery or graveyard, situated in or near to any city, town or village, and used by the inhabitants thereof continuously, without interruption, as a burial-ground for five years, is vested in the inhabitants of such city, town, or village, and the lands must not be used for any other purpose than a public cemetery."

Former Political Code section 3106 ("Section 3106") provided:

"Six or more human bodies being buried in one place constitutes the place a cemetery."

Former Political Code section 3107 ("Section 3107") stated:

"Incorporated cities or towns, and for unincorporated towns or villages, the supervisors of the county, may survey, lay out, and dedicate of the public lands situated in or near such city, town, or village, not exceeding five acres, for cemetery and burial purposes. The survey and description thereof, together with a certified copy of the order made constituting the same a cemetery, must be recorded in the recorder's office of the county in which the same is located."

These statutes were not retroactive; they did not apply to pre-existing cemeteries. (*City of Stockton* v. *Weber, supra,* 98 Cal. at 438.)

In *Wana the Bear* v. *Community Construction, Inc*. (1982) 128 Cal.App.3d 536, the court examined the terms of Sections 3105 and 3106 where it was argued that a Native American burial ground had become a public cemetery under the terms of these statutes. The court rejected the argument, stating:

"Plaintiff claims that the presence of six or more bodies at the burial site in the period between 1854 and the time when the Miwoks were driven out (sometime between 1850 and 1870) rendered the burial ground a 'public grave yard,' indelibly impressing it with such character. But the 1854 law was not incorporated into the 1872 and subsequent law, as claimed

by plaintiff. The 1872 law did not simply reenact section 4 of the 1854 act (making a place where six bodies were buried a 'public graveyard'). It added a prescriptive use condition, vesting title of the graveyard in the city or village using it only when the land was 'used as a public cemetery . . . continuously, without interruption, as a burial-ground for five years.' It further declared that '[n]o part of [the code was] retroactive unless expressly so declared.' In <u>Stockton</u> v. <u>Weber</u> (1893) 98 Cal. 433, these provisions were applied to defeat a claim that a rural cemetery became vested in the public because the plot 'ceased to be used for the burial of the dead more than ten years before [the 1872] section of the code was enacted, and [when the new law took effect was] not being . . . used as a public cemetery.' (*Id*. at 438.) The Miwoks were no longer using the burial ground in 1873, when title VII, chapter V of the Political Code replaced the 1854 law; therefore, the burial ground was not made a cemetery by the operation of new section 3106." (*Id.*, at pp. 539-541; fns. omitted.)

Accordingly, the presence of human remains alone was not sufficient to constitute the required cemetery use under Section 3105. Rather, there must have been burials taking place periodically throughout the prescriptive period. Public prescriptive rights to a cemetery under Section 3105 were established only where the requisite use occurred for a five-year period after 1872. If such a cemetery is currently located in unincorporated territory, the county board of supervisors would be authorized to act as trustee of the property for the "inhabitants" described in Section 3105. In such case, as previously indicated, the county board of supervisors would be vested with management and control of the cemetery. (§ 8131.)

E. Civil Code Section 1007

The requirements of Section 3105 were applicable only to the acquisition of title to privately owned lands used as a public cemetery. Acquisition of title by use of *public* property, or property dedicated to a public use, is generally not permitted. This rule is codified in Civil Code section 1007, enacted in 1872 and amended in 1935 to prohibit the acquisition of title by prescription of state land or land dedicated to public use. (Stats. 1935, ch. 519, § 1.) Civil Code section 1007 provides:

"Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all, but no possession by any person, firm or corporation no matter how long continued of any land, water, water right, easement, or other property whatsoever dedicated to a public use by a public utility, or dedicated to or owned by the state or any public entity, shall ever ripen into any title, interest or right against the owner thereof."

Even prior to 1935, however, adverse possession by a private party could not be asserted against governmental owners of land or land dedicated to a public use. (*Daly City* v. *Holbrook* (1918) 39 Cal.App. 326; *Lapique* v. *Morrison* (1915) 29 Cal.App. 136; *Howard* v. *Oroville* (1913) 22 Cal.App 544.) Hence, Civil Code section 1007 prohibits adverse possession by a private party of a "pioneer" cemetery located on land dedicated to such public use. The statute has no application in determining the management and control responsibilities of a county board of supervisors with respect to such a cemetery.

F. Sections 8825-8829

Acquisition of title to privately owned lands by public use is permitted under current law, but the law deals only with title to lands "situated in or near any city" and vests title in the inhabitants of the city. (§ 8126.) Section 8126, which has been in effect since 1939, does not impose any obligations upon a county board of supervisors.

In 1957 the Legislature enacted a special statutory scheme (§§ 8825-8829) authorizing the dedication of a "pioneer memorial park." A city or county may declare a cemetery "abandoned" for purposes of future interment if it "threatens or endangers the health, safety, comfort or welfare of the public" and "not more that 10 human dead bodies have been interred therein for a period of five years immediately preceding the date of the resolution." (§ 8825.) After removing the threat or danger to the health, safety, comfort, or welfare of the public (§ 8827), the city or county "shall . . . dedicate such abandoned cemetery as a pioneer memorial park . . . ." (§ 8828.) With respect to ownership, control, and management of a pioneer memorial park, section 8828 states in part:

"Upon recordation of the resolution with the county recorder of the county in which the cemetery is located, fee title to the cemetery shall vest in the city or county as the case may be. The governing body may bring an action to quiet title to the cemetery, and in the absence of fraud the resolution and the fact of recordation shall be conclusive evidence of fee title to the cemetery.

"Any county or city acquiring fee title to a cemetery under this section shall only use the property for the purpose of establishing and maintaining a pioneer memorial park."

In answer to the first question, therefore, we conclude that an historic Gold Rush "pioneer" cemetery that was dedicated to public use is subject to the management and control of a county board of supervisors if it is located in unincorporated territory and was acquired or dedicated as a public cemetery pursuant to present or preexisting law and such use has not been terminated. **Footnote No. 3**

2.      Access by Members of the Public

The second question presented concerns the rights of members of the public to visit historic Gold Rush "pioneer" cemeteries that are under the management and control of a county board of supervisors. We conclude that the public's access rights are subject to reasonable rules and regulations.

Section 7 of article XI of the Constitution provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." The "general laws" specifically governing public cemeteries provide in section 8133:

"The authorities having jurisdiction and control of cemeteries may make and enforce general rules and regulations, and appoint sextons or other officers to enforce obedience to the rules and regulations, with such powers and duties regarding the cemetery as may be necessary."

Quoting from *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 160, the Supreme Court in *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 676, stated that "'[i]t has long been settled that [municipal police] power extends to objectives in furtherance of the public peace, safety, morals, health and welfare and "is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life."'"

The scope and terms of a county board of supervisors' regulations regarding public access to an historic "pioneer" cemetery would depend upon the particular circumstances. Security precautions may be necessary, and the board may deem it appropriate to limit public access in order to protect a specific historical site.

We conclude in answer to the second question that the rights of members of the public to visit an historic Gold Rush "pioneer" cemetery dedicated to public use that is under the management and control of a county board of supervisors are subject to reasonable regulations adopted by the county board of supervisors to protect public peace and safety.

\* \* \* \* \*

---

**Footnote No. 1**
This area is also known as the Mother Lode Country and extends from Tuolomne County northward to Shasta County.
**Footnote No. 2**
Hereafter references to the Health and Safety Code are by section number only.
**Footnote No. 3**
A county determination to sell or abandon a cemetery would be subject to judicial scrutiny if challenged as a violation of the terms of the public trust under which it was held. (Cf. *County of Orange* v. *Heim* (1973) 30 Cal.App.3d 694.)